**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:06cv47**

| | | |
|---|---|---|
| **J. G. ASSOCIATES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM** |
| | ) | **OF DECISION** |
| **GREYSTONE SERVICING** | ) | |
| **CORPORATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court in accordance with the provisions of 28, United States Code, Section 636(c), and upon the defendant's Motion for Summary Judgment (#18). The court has before it and has carefully considered the arguments and materials submitted in support and in opposition to such motion, as well as defendant's brief in reply to plaintiff's opposition. Finding that no genuine issues of fact remain for trial, the court will grant the Motion for Summary Judgment for the reasons hereinafter discussed.

## FINDINGS AND CONCLUSIONS

### I.     Introduction

In this action, plaintiff contends that defendant breached its contract with the plaintiff, has been unjustly enriched, and has engaged in unfair and deceptive trade practices when it failed to pay plaintiff a loan-procurement commission in relation to a property development in the State of Oklahoma. Defendant contends that it is entitled to summary judgment on all three claims because plaintiff cannot present admissible evidence of specific facts showing that it procured the ultimate borrower.

## II.    Applicable Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial.  Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*."  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts.  Anderson, supra.  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."  Id. at 248.  A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  Id.

The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem.  Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir.

1980).  Affidavits filed in support of a defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves.  United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper.  Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the *admissible evidence* of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255.  In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

## III.   Factual Background

Plaintiff is a finder or "correspondent" for FHA-insured loans, and is engaged in the business of locating borrowers that are seeking financing for the construction of FHA-insured housing properties, usually apartment complexes.  Compl., at ¶3. The president of the plaintiff J. G. Associates, Inc., is Joel Dimmette, Compl., at ¶1. Defendant is a lender of FHA-insured loans.

In the typical correspondent-lender relationship, the correspondent locates and brings to a lender multiple potential borrowers on multiple different projects over the period of time that the finder and the lender have a contractual relationship with one another. Wolfson Aff., at ¶2.  It is undisputed that at all times relevant to this action plaintiff had a contract with defendant dated October 9, 2002.  Compl, Ex. A. Prior to the instant dispute, plaintiff brought a number of other borrowers to defendant on other projects.

A correspondent may do more than locate and present a borrower to the lender. A correspondent may serve as a conduit to facilitate the flow of information between the prospective borrower and the lender. A correspondent might also locate the real estate and bring to the table any number of other players, including the builder, architect, engineers, surveyor, appraiser, cost analyst, market analyst, and/or environmental analyst. Wolfson Depo., at 170. While there is evidence that plaintiff met with individuals in Oklahoma and helped the proffered borrower find a substitute builder, plaintiff did not otherwise perform any of these collateral functions in the present matter. Pereff Depo., at 38-41; Dimmette Depo., at 58-59.

In relevant part, the agreement between the plaintiff and the defendant provided as follows:

> **Correspondent and Greystone Compensation.** Greystone shall receive a fee at closing equal to 37.5 basis points applied to the committed loan amount. Correspondent shall be entitled to any remaining compensation only upon the closing of a loan and acknowledges that it shall receive no fee in the event a Firm Commitment is not issued and/or the closing of the loan to borrower fails to occur for any reason.

Compl., Ex. A.

It is undisputed that plaintiff brought to defendant a borrower, that being Mansions at Sand Springs, L.L.C. and the two principals of that limited liability company, that being Steven Pereff and Keith Sprik. It is undisputed that Mansions at Sand Springs, L.L.C. and Mr. Pereff and Mr. Sprik were seeking a 12 million dollar loan. Mr. Pereff was, at the time, a 30-year-old electrical subcontractor who had done some work for his father in the construction industry and who, at the time of first meeting, impressed Mr. Dimmette as having very little development experience

-4-

and very limited financial ability. Pereff Depo., at 7 & 36; Dimmette Depo., at 38, 41, & 42.  Mr. Sprik was a building contractor.  Dimmette Depo., at 66, 67, & 68.

While it appears that a correspondent usually finds a borrower, it is undisputed in this case that the borrower found the correspondent.  Through a mutual acquaintance, Mr. Pereff contacted Mr. Dimmette and arranged to meet him in the Atlanta airport where they spoke for several hours. At that meeting Mr. Dimmette told Mr. Pereff what he would need to submit an application for an FHA-insured loan. Dimmette Depo., at 40-41.  Mr. Dimmette,  Mr. Pereff and Mr. Sprik then met on a second and final occasion in Tulsa, Oklahoma.  By the time Mr. Dimmette came to Tulsa, Mr. Pereff had found the land on which the apartment project was to be built, had obtained an option on that land, and had lined up all of the needed players to complete the project: builder, architect, engineers, surveyor, appraiser, cost analyst, market analyst, and environmental analyst.  Pereff, at  38-41. Mr. Dimmette spoke to some of these third parties on one day and visited the site and on the second day visited the HUD office in Oklahoma City. Dimmette Depo., at 64-67. Based on such contacts with the borrower, the property, and the contractors, Mr. Dimmette recommended that Mansions at Sand Springs, L.L.C., Mr. Pereff and Mr. Sprik to defendant as borrowers on a twelve million dollar FHA-insured loan. Dimmette Depo., at 45 & 46.

Thereafter, Mr. Dimmette gathered together the information necessary for the loan application and provided that to defendant for submission to the FHA. Compl., at ¶9.  On April 16, 2004, the FHA issued a firm commitment to insure the loan for

Mansions. Compl., at ¶11. Defendant thereafter issued a loan commitment and at that same time the parties all agreed to fix the rate of interest for the loan.[1]

It is also undisputed that the loan plaintiff had acquired for Mansions at Sand Springs, L.L.C., Mr. Pereff and Mr. Sprik did not close.   Mr. Pereff and Mr. Sprik, the members of Mansions at Sand Springs, L.L.C., could not raise the capital for the loan to close.  Compl., at ¶ 13.  The loan failed to close before the HUD commitment to insure the loan expired in March 2005, and Mansions' option to purchase the real estate on which the proposed apartment project was to be built also expired. Pereff Depo., at 58.

Along with the loan not closing, the team assembled by Mr. Pereff, which had apparently performed substantial work in furtherance of the proposed development, had not been paid, Wolfson Aff., at ¶6, and it is undisputed that the architect and engineer continued to own and had the right to sell their plans to anyone who expressed interest in construction of an apartment project at the same location. Dimmette Depo., at 120-121.  In furtherance of and early in his association with Mansions, Mr. Sprik approached a business colleague named Ron Wuerch about investing in the Mansions project. Wuerch Depo., at 7-8. Mr. Wuerch is a licensed real estate broker in Tulsa and is also involved in real estate consulting and

---

[1]     Defendant has shown that it then pre-sold the loan to a third-party and sustained a loss when it had to pay third-party a breakage fee when the Mansions loan failed to close.  Wolfson Aff., at ¶5. The court agrees with plaintiff, however, that such loss to defendant based on its unilateral decision to pre-sell the loan is of no consequence or import to the issues in this case.  It does, however, provide a relevant reason, that being recoupment of loss, as to why defendant would seek to secure an able borrower in the event Mansions was not resuscitated.

development. Wuerch Depo., at 6. Mr. Wuerch made it a condition of any involvement he might have in Mansions that Mr. Pereff not be involved, and when Mr. Pereff failed to withdraw or sell his interest, Mr. Wuerch and his investor group lost interest in any participation in that entity. Wuerch Depo., at 15, 22, & 76.

When Mansions failed to close its loan, Mr. Wuerch - - who was apparently interested in the project, but not interested in being partners with Mr. Pereff - - had already formed a new entity called Highland Crossing LP. While plaintiff has argued and has attempted to tender evidence that Mr. Sprik was among the limited partners in Highland Crossing LP, some of the evidence which it has submitted in that regard is inadmissable as discussed below. It is, however, undisputed that Highland Crossing LP, as originally conceived, was to have included Mr. Sprik. It is undisputed, based on the admissible evidence, that when the rubber hit the road, Mr. Sprik was unable to make the required financial commitment to Highland Crossing LP and did not become a member or an owner of any interest in Highland Crossing LP. Sprik Aff., at ¶¶4-5-6. Considering all of the admissible evidence of record, it is undisputed that there was no overlap in the investors constituting Mansions and the partners in Highland Crossing. Sprik Aff., at ¶¶4-5; Wuerch Depo., at 39-40, 50, & 52; Pereff Depo., at 27.

After Mansions failed to close, Mr. Wuerch learned from the owner of the land on which the project was to be built that Mansions' option had expired, and that the property was available. Wuerch Depo., at 37. Highland Crossing quickly filled the void left by Mansions and obtained a new option to purchase and acquired the plans

from the unpaid architect and engineer.  Wuerch Depo., at 26-29, 40-45.

While each party places a different spin on what occurred, it appears undisputed that up until March 21, 2005, the defendant was working on the two deals concerning the same project;  the first being the Mansions deal, which despite efforts to give it new life, was never resurrected; and in reserve, the Highland Crossing deal, which defendant had cultivated and not disclosed to plaintiff.  Wolfson Depo., at 151-52, 162, 168-71, & 173.[2]  As discussed below, plaintiff contends that such failure to disclose constitutes an unfair and deceptive trade practice; defendant contends (and has presented evidence to such effect, Wolfson Depo., at 169) that it was prepared to refile the loan up through March 21, 2007, and further that it  had no obligation to disclose the Highland Crossing loan and in fact was obligated to that borrower to keep that loan confidential. Mr. Wuerch testified that defendant did not instigate the new relationship with Highland Crossing, but rather that Mr. Wuerch contacted defendant, the landowner, and the other third parties whose work had gone unused and unpaid for in the Mansions project.  Wuerch Depo., at 45-46; c.f. Wolfson 63, 64, & 124. It is undisputed that Wuerch had no knowledge of plaintiff, and that plaintiff played no role in the Highland Crossing project, Wolfson Depo., at 75, and did not even know of Highland Crossing's existence until after the loan closing.  Compl., at ¶¶ 18, 19.

To summarize the evidence: Pereff found plaintiff and Sprik; Pereff and Sprik

_____

[2]    While plaintiff again argues that Mansions and Highland Crossing consisted of "virtually the same group of investors," plaintiff's Brief in Response, at 4, there is no admissible evidence that supports such argument.

formed Mansions; Sprik found Wuerch, who refused to join Mansions unless Pereff left; Pereff refused to leave, and Wuerch never joined Mansions; Pereff and Sprik did not have the required capital and Mansions failed; Wuerch formed Highland Crossing, and invited Sprik to join; Sprik lacked the required capital contribution and never joined Highland Crossing; and Highland Crossing approached the land owner, the architect and engineer, and defendant and eventually closed a loan with defendant on August 31, 2005, some five months after the deadline passed to close the Mansions loan. Wolfson Depo., at 95-96.

## III.    Inadmissible Evidence

### A.    Introduction

In its brief, plaintiff identifies two pieces of evidence that it contends creates genuine issues of material fact barring summary judgment:

(1)    First, a letter attached to the plaintiff's complaint ostensibly from Sprik to Pereff., in which Sprik supposedly informs Pereff of his intention to file a civil action against Pereff and in which he allegedly states:

> Also, before you see it on the news soon, I want to be the one to tell you guys that I closed Sand Springs last week. We will have a ground breaking and Texas BBL starts moving dirt this week. I ended up as one of the largest shareholders in the deal. God is slowly restoring what has been stolen.

and

(b)    Second, deposition testimony of Barry Austell-Wolfson ("Wolfson"), an employee of the defendant, that purports to show that Sprik owned an interest in Highland Crossing LP.

The defendant, in its reply, argues that these items are inadmissible. Rule 56(e) of the Federal Rules of Civil Procedure provides as follows:

> **(e) Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

## B.    The Sprik Letter

There is no evidence or admission of Sprik in this case that Sprik authored the letter that plaintiff has tendered. As a matter of well settled law, plaintiff simply cannot tender a letter based on its own information and belief alone.

In <u>Orsi v. Kirkwood</u>, 999 F.2d 86 (4th Cir. 1993), the plaintiffs offered into evidence three letters at the summary judgment hearing. The district court refused to consider the three letters in making a ruling on a motion for summary judgment. On appeal, the appellate court stated:

> Additionally, plaintiffs did not offer their proof in the proper, authenticated form. It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment. <u>Hal Roach Studios, Inc. v. Richard Feiner and Co.</u>, 896 F2.d 1542, 1550-51 (9th Cir. 1990); <u>Martz v. Union Labor Life Ins. Co.</u>, 757 F.2d 135, 138 (7th Cir. 1985). To be admissible at the summary judgment state, "documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)." 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2772, at 58-60 (1983 & 1993

Supp.). In particular, a letter "must be attached to an affidavit and authenticated by its author in the affidavit or a deposition." *Id*. at 60. Of the letters offered by plaintiffs, only one, the Clifford letter, was even signed, much less authenticated by an author. None of the four documents were attached to affidavits, and the district court had no immediate way of ascertaining whether the documents were even what they purported to be.

In <u>Adullah v. Board of Governors</u>, 2005 WL 4436043 (E.D.N.C. 2005), plaintiff in opposing defendant's motion for summary judgment presented three letters that had been notarized. The district court declined to consider those letters as evidence. In discussing the admissibility of the letters, the district court held, as follows:

It is evident from the letters themselves that they are notarized but that the authors did not swear or attest to the truthfulness of their contents. Despite the fact that the authors of the statements had their signatures witnessed by notaries public, the letters are not and do not purport to be affidavits, and the letters do not comply with the requirements of Rule 56(e). See <u>Chaiken v. VV Pub. Corp.</u>, 119 F.3d 1018, 1033 (2nd Cir. 1997) (refusing to allow plaintiff to rely on unsworn letters of "experts" to defeat summary judgment because letters did not meet requirements of Rule 56(e)), cert. denied, 522 U.S. 1149, 118 S.Ct 1169, 140 I. Ed.2d 179 (1998); <u>Barlow v. Connecticut</u>, 319 F.Supp.2d 250, 260 (D.Conn. 2004) ("Unsworn statements, letters addressed to litigants, and affidavits composed of hearsay and non-expert opinion evidence do not satisfy Rule 56(e) and must be disregarded.") <u>Rodriguez v. Lauren</u>, 77 F.Supp.2d 643, 647 n. 10 (E.D.Pa. 1990) (declining to consider the contents of the unsworn statement from plaintiff's co-worker corroborating his claims of discrimination explaining that "[u] unsworn statements do not meet the requirements of 'affidavits' and thus cannot be used to support motions for summary judgment or responses thereto, see <u>Small v. Lehman</u>, 98 F.3d 762, 764 n. 5 (3rd Cir. 1996).").

Nor can the three statements qualify under 28 U.S.C. § 1746, which permits a court to accept unsworn statements if the person giving the statement subscribes to it in writing under penalty of perjury. An examination of the statements reveals that although Figgures, Brownie and Branch had their statements notarized, there is no indication that oaths were administered to any of the three individuals, or that their statements were given under penalty of perjury. See, e.g., <u>Mroz v. City</u>

of Tonawanda, 999 F.Supp. 436, 458 (W.D.N.Y. 1998). Indeed, Brownie subsequently provided affidavit testimony indicating that he did not "take an oath or swear to the contents of [his] letter." (Brownie Aff. ¶ 2.)

Id., at 7-8.

The letter which the plaintiff has proffered is not verified, Sprik has made no admission that he authored the letter, and such letter is simply attached to the verified Complaint. Plaintiff alleged in its verified Complaint, as follows:

> 23.   Upon information and belief, Keith Sprik, a member of the Mansions at Sand Springs, LLC, also has a substantial ownership interest in Highland Crossing, L.P. In a letter from Keith Sprik to Stephen Pereff dated September 3, 2005, Mr. Sprik stated that he "ended up as one of the largest shareholders in the [Sand Springs] deal." A true copy of this letter is attached hereto as **Exhibit H** and fully incorporated herein by reference.

In Dougherty v. Food Lion, LLC, 2006 WL 1642233 (W.D.N.C. 2006), the district court reviewed and set forth the law as to consideration of verified complaints and attachments to verified complaints submitted in opposition to a motion for summary judgment. The court held, as follows:

> A verified complaint, such as that filed in this case, is treated as an affidavit for purposes of summary judgment. See, e.g., Walker v. Tyler County Comm'n, 11 Fed. Appx. 270, 274 (4th Cir. 2001). However, as with an affidavit, the statements made therein must be based on first-hand knowledge. Id. Inadmissible hearsay, speculation, innuendo, and legal conclusions, whether "cast in the form of factual allegations" or not, do not take on the protective cloak of "fact" for purposes of summary judgment merely because the complaint has been signed under oath. See, Causey v. Balog, 162 F.3d 795, 803 n. 4 (4th Cir. 1998) ("Rule 56(e) precludes consideration of materials not based on the affiant's first hand knowledge."); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (same); Farm Credit Servs. of Am. v. Am State Bank, 339 F.3d 764, 769 (8th Cir. 2003) (legal conclusions are not treated as fact

merely because plaintiff casts them in such a form). Furthermore, "a verified complaint that alleges facts that are made on belief or information and belief is insufficient to oppose summary judgment." *Walker, supra*. Where the Court can differentiate between those alleged facts claimed to be based on personal knowledge and those claimed to be based upon information or information and belief, it will divide the facts into their respective categories giving each category its corresponding treatment; where this is not possible, however, the entire verified complaint loses its right to treatment as an affidavit. *Id*. (disregarding the entirety of the verified complaint for purposes of summary judgment where the court was unable to differentiate between facts that were and were not based on personal knowledge).

Id., at 4.

The letter attached to the plaintiff's complaint is not a self authenticating document, it is not signed by its maker, and it is not sworn to in any fashion. The letter is not addressed to the plaintiff, but is addressed to Pereff, who may or may not be the Steve Pereff who was involved as a member of Mansions at Sand Springs, L.L.C.

Such letter is attached to the verified Complaint, but the allegations referencing such letter are explicitly made upon "information and belief." The letter, as presented, does not qualify for admission based upon any evidentiary standard and the court can neither admit nor properly consider its content in the summary judgment decision in this matter.[3]

---

[3]    Even if such letter were admissible, it does not appear that it would create a genuine issue of material fact inasmuch as the alleged Sprik declaration that he was one of the largest shareholders in the "deal" would appear to be pure bravado inasmuch as there is absolutely no evidence that Sprik participated or had the financial ability to participate in Highland Crossing.

### C.    Wolfson's Testimony

As to the second piece of evidence proffered by plaintiff, it is undisputed that Wolfson is a senior underwriter in the employ of the defendant.  Wolfson Aff. ¶ 1. At his deposition, Wolfson was shown a document, which is identified as Exhibit #37 which Mr. Wolfson describes as "the underwriters narrative that would have accomplished-assuming this really is the attachment that was attached to this." Wolfson Depo., at 187, 188.  Wolfson was then asked the following question by plaintiff's counsel:

> Q    Correct.    And it identifies, in the bottom row, persons that I understand to be general partner and limited partners of RNAW Investments, LP; and that in includes Mr. Wright, Mr. Richardson, who I believe you previously indicated may have simply served as a place holder, Mr. Sprik, and Mr. Wuerch.
>
> A    Correct.
>
> Q    Is that correct?
>
> A    Yes,
>
> Q    Do you know whether, aside from Mr. Richardson, as the deal substantially proceeded and closed, Messrs. Wright, Sprik and Wuerch remained interested, either as general or limited partners in the RNAW Investments group?
>
> A    They did.

The defendant contends that the testimony should not be considered because it was "not based on first-hand knowledge".   Defendant's brief, at 5.  In regard to Wolfson's testimony regarding the words appearing on the exhibit and document that was presented him, the testimony of Wolfson is not hearsay.  Wolfson, at that point,

was not testifying as to the truth of the matter therein asserted, but only as to what was written on the document.

Later in the deposition, Mr. Wolfson was asked questions concerning his knowledge of the closing of the transaction and whether or not Mr. Sprik was still an investor at closing:

> Q     I have just a couple of questions, one regards the involvement of Mr. Sprik as an investor at closing. I believe you indicated, in response to Mr. Combs' questions, that you understood that Mr. Sprik remained an investor in Highland at the time of closing. Why do you think that to be true?
>
> A     I only think that to be true because of the documentation I received from the borrower sometime before closing.
>
> Q     What document was that?
>
> A     That would have been, really, just a list of names and percentages, rather than actual documents from the borrower showing percentages. And at the time of closing, those percentages may or may not have been accurate, since Keith had a 21 percent interest in a 97 percent folder; therefore, well less than 25 percent. Had his interest been changed, they would not have even told me.
>
> Q     Let me take that in two parts. In fact, do you have any knowledge as to what, if anything, happened to Mr. Sprik between the time you saw this listing prior to closing and the actual time of closing?
>
> A     No
>
> Q     The second part of what I think you've just said is, if there had been a change, would it have been an obligation to report that to either Greystone or HUD?
>
> A     No
>
> Q     Why not?
>
> A     Because he was not a principal.

Wolfson Depo., at 248, 249.

Rule 56(e) of the Fed.R.Civ.P. requires "affidavits be made on personal knowledge, shall set forth such facts as would be admissible into evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein." Mr. Wolfson's testimony regarding Mr. Sprik's ownership interest as of the date of closing was not made on personal knowledge and therefore cannot be considered as evidence in this matter.

## IV. Discussion

The issue common to all three claims is whether there is a genuine issue of material fact as to whether plaintiff is due a commission or other damages based on defendant consummating a loan with Highland Crossing some five months after the deal plaintiff had brought to defendant fell through. The court will discuss such issue in context with each of plaintiff's three causes of action, *seriatim*.

### A. First Cause of Action: Breach of Contract

Review of the contract annexed as Exhibit A to the Complaint reveals that such agreement between these parties is not loan specific, and would be applicable to any borrower plaintiff procured for defendant. The way this court sees it, there are two separate and distinct borrowers that came to the table with defendant, Mansions and Highland Crossing, seeking loans which will be addressed separately for the sake of simplicity.

#### 1. The Mansions Loan

Based on the clear terms of the parties' agreement, plaintiff was entitled to

receive its commission "only upon the closing of a loan and . . . shall receive no fee in the event a Firm Commitment is not issued and/or the closing of the loan to borrower fails to occur for any reason." Compl., Ex. A.

> If the language of the contract is clear and unambiguous, we interpret the contract as written and do not look beyond the terms to see what the parties' intent might have been.

Estate of Waters v. Comm'r of the Internal Revenue Serv., 48 F.3d 838, 844 (4th Cir. 1995) (citations omitted). The language of the contract in this matter is clear and simply provides no fee or commission in the event the borrower fails to close the loan.

In this case, it is undisputed that the Mansions loan failed to initially close due to lack of capitalization, that defendant was willing to resubmit such application electronically up until the last moment on March 21, 2005, if Mansions could obtain needed capital, but that Mansions was never able to secure sufficient capitalization and that such loan never closed. Parties who expressly agree "are presumed to have contemplated and assumed the risks normally attendant to their bargain." Beckham v. Klein, 59 N.C.App. 52, 58 (1982). There is no allegation that defendant interfered with the closing of such loan, in any manner provided sub-par assistance to Mansions, or in any way interfered with Mansions in an attempt to avoid payment of a fee or commission to plaintiff. Indeed, the overwhelming evidence indicates that defendant had every reason to facilitate the closing of the Mansions' loan as it was in defendant's best financial interest. In the end, it is undisputed that Mansions could never close the loan.

Thus, there is no genuine issue of material fact as to whether plaintiff is due a

commission based on bringing Mansions to the closing table inasmuch as the Mansions loan never closed. To the extent plaintiff seeks a commission for introducing Mansions to defendant, the court will enter judgment in favor of defendant and against plaintiff as to such claim.

## 2. Highland Crossing

As discussed above, and based on the clear terms of the parties' agreement, plaintiff was entitled to receive its commission "only upon the closing of a loan and . . . shall receive no fee in the event a Firm Commitment is not issued and/or the closing of the loan to borrower fails to occur for any reason." Compl., Ex. A. It is undisputed that Highland Crossing closed a loan with defendant, and plaintiff is entitled to its commission only if it was responsible for bringing such borrower to the defendant's table. Thus, plaintiff would be entitled to a fee or commission under its contract with defendant if (1) Highland Crossing was involved as a borrower in the Mansions' loan or (2) the Highland Crossing loan was a direct and proximate result of plaintiff's efforts or services. Horack v. Southern Real Estate Co. of Charlotte, 150 N.C. App. 305, 312 (2002). Clearly, there is absolutely no evidence that either Highland Crossing or Wuerch were involved as borrowers in the Mansions' loan, and in fact the evidence is antithetical to such a contention inasmuch as Wuerch refused to consider participating in Mansions if Pereff remained associated with such transaction, which he did to the end.

Turning next to considering whether the Highland Crossing loan was a direct and proximate result of plaintiff's efforts, plaintiff has a tough row to hoe. Simultaneously with arguing that it is responsible for bringing Highland Crossing to

the table, plaintiff is arguing that it did not even know of Highland Crossing's existence until after defendant closed the Highland Crossing loan which was some five months after the Mansions loan failed to close. Further, plaintiff has conceded that it never even met Highland Crossing's principal investor, Wuerch, and that Sprik, not plaintiff, was responsible for introducing Wuerch to the Mansions' project. Thus, it is plaintiff's contention that it is due a commission under the contract because it was responsible for bringing Pereff and Sprik to the table, and that Sprik was responsible for attempting to bring in Wuerch, and that Sprik's efforts should, therefore, inure to plaintiff's benefit.

It appearing that the occupation of loan correspondent or mortgage broker is a profession of recent origin, this court has relied on the kindred and well developed law of North Carolina concerning when a real estate broker is entitled to a commission. Generally, a real estate broker is entitled to a fee or commission whenever he or she "procures a party who actually contracts for the purchase of the property at a price acceptable to the owner." Sessler v. Marsh, 144 N.C.App. 623, 629-30 (2001) (citation omitted). The broker is the "procuring cause" only "if the sale is the direct and proximate result of his efforts or services." Id., at 630 (citation omitted). The term "procuring cause" refers to "a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker." Id. (citation omitted). As used to refer to a broker's activity, the term *procuring cause* "means more than 'but for' causation." Marshall v. White, 245 F.Supp. 514, 517 (W.D.N.C.

1965).

The court finds that the facts in <u>Marshall</u> are nearly identical to the situation presented in this case and that the result reached by then chief judge of this court, Honorable J. Braxton Craven, then United States District Judge (and later Court of Appeals for the Fourth Circuit Judge, now deceased), remains good law in North Carolina despite its age.[4]  The court in <u>Marshall</u> concluded that a broker who introduced the defendant - - a developer of hotels and motels - - to a potential lessee, who in turn subsequently brought in other parties that formed a company to lease defendant's property, was not the "procuring cause" of the lease. <u>Id.</u>, at 517.  First, the district court found that plaintiff was the "but for" cause of the lease, because the syndicate that eventually leased the property might never have come to fruition "but for" the efforts of plaintiff.  Judge Craven, however, then concluded that making a contact "that proved to be subsequently valuable . . . is not enough." <u>Id.</u>  Similar to the case now before this court, Judge Craven emphasized that the potential lessee whom the plaintiff broker had put into contact with defendant "was unable to rent the property individually." <u>Id.</u>

Additionally, the court in <u>Marshall</u> pointed out the plaintiff broker's (1) lack

---

[4]      Honorable Mark Martin of the North Carolina Court of Appeals distinguished *Marshall* from the facts presented to the appellate court in *Sessler v. Marsh*, *supra,* finding that the plaintiff broker was entitled to a commission. <u>Id.</u>, at 630-31.  In *Sessler,* Judge Martin found that the plaintiff broker: (1) introduced the buyer to defendant after she and the buyer had several conversations regarding purchase of the property; (2) facilitated a meeting between the buyer and defendant at which time a purchase agreement was discussed; and (3) participated in the negotiation of a sales contract that contained a purchase price and a commission for her. <u>Id.</u>, at 627.  Thus, *Marshall* is relevant and remains vital in North Carolina jurisprudence.

of involvement in the final lease transaction inasmuch as the plaintiff broker never spoke with any of the stockholders or officers of the company formed to lease the property; (2) at least one of the company's shareholders had never heard of plaintiff until the lawsuit was filed; and that (3) the broker was not involved in the negotiations surrounding the final transaction. Id. Here, the evidence is even less compelling than it was in Marshall, with the uncontradicted evidence showing that none of plaintiff's contacts were involved in Highland Crossing, none of plaintiff's contacts or any of the participants in Mansions were partners in Highland Crossing, that plaintiff had no knowledge of Highland Crossing's existence before it closed its loan, that Highland Crossing's principal Wuerch did not know or have any contact with plaintiff or its principal Mr. Dimmette, and that plaintiff had absolutely no involvement in putting the Highland Crossing loan package together as it did for the Mansions' deal.

While it is true that Highland Crossing ended up building the same project at the same location that Mansions had intended to build and used substantially the same contractors, it would appear that none of those acts are in any way attributable to plaintiff, but are instead attributable to the unilateral action of Wuerch and Highland Crossing, which saw an opportunity to step in when the deal orchestrated by plaintiff, Pereff, and Sprik failed. Clearly, there was a complete break in the continuity of events. Highland Crossing stepped in and picked up the pieces without any involvement of plaintiff. That Wuerch was initially made aware of the proposed project by one of the partners in Mansions in not sufficient to constitute or be the origin of "a series of events which, without break in their continuity, result in the

accomplishment of the prime object of the employment of the broker." Sessler v. Marsh, supra, at 630. The plaintiff contends that Sprik was a member of and involved in Highland Crossing. As stated previously, the evidence that the plaintiff contends establishes this fact, that being the letter of Sprik and the testimony of Wolfson is inadmissable. Overriding the issue of the admissibility of evidence is the affidavit of Sprik presented by the defendant in which Sprik avers that he wanted to be an investor in Highland Crossing but was not able to make the required investment and that he never owned any interest in Highland Crossing.

Mr. Wuerch testified in his deposition that Mr. Sprik was given an opportunity to have an ownership interest in Highland Crossing but due to the fact that he never invested his money financially, he never, in fact, became a member or participant in Highland Crossing. Wurech Depo., at 52.

Finding that there is no genuine issue of material fact and that there is no evidence upon which the finder of fact could find that plaintiff was the procuring cause of the Highland Crossing loan, the court will grant summary judgment in favor of defendant on this claim.

### B. Second Cause of Action: Unjust Enrichment/*Quantum Meruit*

In its responsive brief, plaintiff argues that its claim for unjust enrichment is viable inasmuch as the contract between the litigating parties would have not been applicable to the transaction with Highland Crossing. The court disagrees, inasmuch as the contract attached as Exhibit A to the Complaint is not loan specific and appears to cover any borrower plaintiff may bring as correspondent to the table with defendant during the relevant period. The law in North Carolina appears to be clear

that:

> An implied contract is not based on an actual agreement, and *quantum meruit* is not an appropriate remedy when there is an actual agreement between the parties. Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment.

Whitfield v. Gilchrist, 348 N.C. 39, 497 S.E.2d 412, 415 (N.C. 1998); accord Pritchett & Burch, PLLC v. Boyd, 169 N.C.App. 118, 124 (2005). Plaintiff's claim in quasi contract is, therefore, barred as a matter of well settled North Carolina law and summary judgment will be granted to defendant on such claim.

### C. Third cause of Action: Unfair or Deceptive Trade Practices

A state-law claim for Unfair and Deceptive Trade Practices is governed by Chapter 75-1.1(a) of the North Carolina General Statutes, which provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Id. Section 75-1.1(b) was amended in 1977 to read "[f]or the purposes of this section "commerce" includes all business activities, however denominated . . . ." Id.

The UDTPA is, without doubt, a scheme regulating conduct between buyers and sellers and between businesses. See Roberson v. Dale, 464 F.Supp. 680 (M.D.N.C. 1979). See also Liggett Group, Inc. v. Sunas, 113 N.C. App. 19, 31 (1993); Buie v. Daniel Int'l, 56 N.C. App. 445, 448, cert. denied, 305 N.C. 759 (1982). To state a cause of action under the UDTPA, plaintiff must allege and on summary judgment come forward with evidence upon which a jury could find in its

favor on each of the following:

(1)    conduct constituting an "unfair or deceptive act or practice;"

(2)    conduct "in or affecting commerce," and

(3)    that such conduct proximately caused actual injury to plaintiff.

Food Lion, Inc. v. Capital Cities/ABC Inc., 951 F. Supp. 1224, 1230 (M.D.N.C. 1996).  In North Carolina, a trade practice is unfair "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  Horack, supra, at 310.  A trade practice is deceptive "if it has the capacity or tendency to deceive; proof of actual deception is not required."  Id.

Even an intentional breach of contract will not constitute an unfair or deceptive trade practice in North Carolina, but instead the plaintiff must show "substantial aggravating circumstances attendant to the breach must be shown."  Canady v. Crestar Mortg. Corp., 109 F.3d 969, 975-76 (4th Cir. 1997).  Substantial aggravating circumstances "include an intentional misrepresentation made for the purpose of deceiving another and which has the natural tendency to injure another...."  DirecTV, Inc. v. Amerilink Corp., 2004 WL 1618572, *7 (M.D.N.C.2004)(citations and corresponding quotation marks omitted).[5]

Construing the evidence in the light most favorable to plaintiff, the failure to

_____

[5]    Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the docket through reference to the Westlaw citation.

pay a fee cannot constitute an unfair and deceptive trade practice as that would have been, if proved, a mere breach of contract. Horack, supra. At most, plaintiff has shown that defendant failed to disclose to plaintiff that it had a loan in reserve that it intended to close if the Mansions deal fell through. Plaintiff has failed to show, however, that defendant had any obligation to disclose the existence of such relationship with Highland Crossing.

Finding that plaintiff has not presented evidence upon which a finding could be made in its favor on this claim, the court will grant summary judgment in favor of defendant.

## IV.    Conclusion

Having closely reviewed all the arguments and materials submitted by the respective parties, the court concludes that no genuine issues of material fact remain for trial and that defendant is entitled to judgment in its favor on all claims. A judgment is entered simultaneously herewith consistent with this Memorandum of Decision, therein granting defendant's Motion for Summary and dismissing this action in its entirety with prejudice.

Signed: June 26, 2007

Dennis L. Howell
United States Magistrate Judge